UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NATALIE HERNANDEZ, | ) | CIVIL ACTION NO. 4:19-CV-1263 |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | (ARBUCKLE, M.J.) |
| ANDREW SAUL, | ) | |
| Defendant | ) | |

<u>MEMORANDUM OPINION</u>

## I.   INTRODUCTION

Plaintiff Natalie Hernandez, an adult individual who resides within the Middle District of Pennsylvania, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Jurisdiction is conferred on this Court pursuant to 42 U.S.C. §405(g) and 42 U.S.C. §1383(c)(3).

This matter has been referred to me upon consent of the parties pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. After reviewing the parties' briefs, the Commissioner's final decision, and the relevant portions of the certified administrative transcript, I find the Commissioner's final decision is supported by substantial evidence. Accordingly, Commissioner's final decision is AFFIRMED.

II.     BACKGROUND & PROCEDURAL HISTORY

On June 14, 2016, Plaintiff protectively filed applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. (Admin. Tr. 17).  In these applications, Plaintiff alleged she became disabled as of April 1, 1976, but later amended her alleged onset date to April 9, 2016. (Admin. Tr. 36). As of her amended alleged onset date, Plaintiff was forty-six years old. She alleged she was disabled due to the following conditions: anxiety, depression, migraines, high blood pressure, and history of seizures. (Admin. Tr. 206). Plaintiff alleges that the combination of these conditions affects her ability to lift, bend, stand, reach, walk, kneel, climb stairs, see, remember, understand, following instructions, and get along with others. (Admin. Tr. 236). Plaintiff has at least a high school education and is able to communicate in English. (Admin. Tr. 25).

On January 7, 2017, Plaintiff's applications were denied at the initial level of administrative review. (Admin. Tr. 17). On January 12, 2017, Plaintiff requested an administrative hearing. *Id.*

On March 5, 2018, Plaintiff, assisted by her counsel, appeared and testified during a hearing before Administrative Law Judge Scott M. Staller (the "ALJ"). (Admin. Tr. 32). On June 8, 2018, the ALJ issued a decision denying Plaintiff's applications for benefits. (Admin. Tr. 26). On July 20, 2018, Plaintiff requested

review of the ALJ's decision by the Appeals Council of the Office of Disability Adjudication and Review ("Appeals Council"). (Admin. Tr. 159).

On July 21, 2018, the Appeals Council denied Plaintiff's request for review. (Admin. Tr. 9).

On July 22, 2019, Plaintiff initiated this action by filing a Complaint. (Doc. 1). In the Complaint, Plaintiff alleges that the ALJ's decision denying the applications is not supported by substantial evidence, and improperly applies the relevant law and regulations. (Doc. 1, ¶ 13). As relief, Plaintiff requests that the Court award benefits, or in the alternative remand this matter for a new administrative hearing. (Doc. 1, ¶ 14).

On September 24, 2019, the Commissioner filed an Answer. (Doc. 7). In the Answer, the Commissioner maintains that the decision holding that Plaintiff is not entitled to disability insurance benefits was made in accordance with the law and regulations and is supported by substantial evidence. (Doc. 7, ¶ 9). Along with her Answer, the Commissioner filed a certified transcript of the administrative record. (Doc. 8 *et seq*).

Plaintiff's Brief (Doc. 11), the Commissioner's Brief (Doc. 12), and Plaintiff's Reply (Doc. 13) have been filed.  This matter is now ripe for decision.

III.   STANDARDS OF REVIEW

A.   SUBSTANTIAL EVIDENCE REVIEW – THE ROLE OF THIS COURT

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); 42 U.S.C. § 1383(c)(3); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).

"In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003). The question before this Court, therefore, is not whether Plaintiff is disabled, but whether the Commissioner's finding that Plaintiff is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

B.    STANDARDS GOVERNING THE ALJ'S APPLICATION OF THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A);

42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a).[1] To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. § 404.1520(a); 20 C.F.R. § 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or

---

[1] Throughout this Report, I cite to the version of the administrative rulings and regulations that were in effect on the date the Commissioner's final decision was issued. In this case, the ALJ's decision, which serves as the final decision of the Commissioner, was issued on June 8, 2018.

her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); *see also* 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a)(1); 20 C.F.R. § 416.920(e); 20 C.F.R. § 416.945(a)(1). In making this assessment, the ALJ considers all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. § 404.1545(a)(2); 20 C.F.R. § 416.945(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. 2 U.S.C. § 423(d)(5); 42 U.S.C. § 1382c(a)(3)(H)(i) (incorporating 42 U.S.C. § 423(d)(5) by reference); 20 C.F.R. § 404.1512(a); 20 C.F.R. § 416.912(a); *Mason*, 994 F.2d at 1064.   Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the

claimant's age, education, work experience and RFC. 20 C.F.R. § 404.1512(b)(3); 20 C.F.R. § 416.912(b)(3); *Mason*, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. *Id.* at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 433 (3d Cir. 1999).

## IV.   ANALYSIS

Plaintiff raises the following issues in her brief:

(1)    Substantial Evidence does not support the ALJ's evaluation of the opinion evidence; and

(2)    The ALJ's multiple errors with symptom evaluation compel reversal.

(Doc. 11, p. 1).

A.     THE ALJ'S DECISION DENYING PLAINTIFF'S APPLICATIONS

In his June 2018 decision, the ALJ found that Plaintiff met the insured status requirement of Title II of the Social Security Act through September 30, 2021. (Admin. Tr. 19). Then, Plaintiff's applications were evaluated at steps one through five of the sequential evaluation process.

At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity at any point between April 9, 2016 (Plaintiff's amended alleged onset date) and June 8, 2018 (the date the ALJ decision was issued) ("the relevant period"). (Admin. Tr. 19). At step two, the ALJ found that, during the relevant period, Plaintiff had the following medically determinable severe impairment(s): bipolar disorder and generalized anxiety disorder. (Admin. Tr. 19). The ALJ also found that Plaintiff has the following medically determinable non-severe impairments: hypertension, back pain, foot pain, bilateral soft tissue hand masses, and gallstones. (Admin. Tr. 20-21). At step three, the ALJ found that, during the relevant period, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Admin. Tr. 21).

Between steps three and four, the ALJ assessed Plaintiff's RFC. The ALJ found that, during the relevant period, Plaintiff retained the RFC to engage in all

ranges of work work as defined in 20 C.F.R. § 404.1567 and 20 C.F.R. § 416.967 except that:

> Claimant is able to understand, remember, and carry out simple 1-2 step instructions and make judgments on simple work-related decisions; could occasionally interact with coworkers, supervisors, and the public in a routine work setting; and is limited to occasional decision-making and occasional changes in a routine work setting.

(Admin. Tr. 22).

At step four, the ALJ found that, during the relevant period, Plaintiff could not engage in her past relevant work. (Admin. Tr. 25). At step five, the ALJ found that, considering Plaintiff's age, education and work experience, Plaintiff could engage in other work that existed in the national economy. *Id*. To support his conclusion, the ALJ relied on testimony given by a vocational expert during Plaintiff's administrative hearing and cited the following three (3) representative occupations: Bench Assembler (DOT #706.684-022); Packing Line Worker (DOT #753.687-038); Production Solderer (DOT #813.684-022). (Admin. Tr. 25-26).

B.   WHETHER THE ALJ PROPERLY EVALUATED CRNP CANAL'S OPINION ABOUT PLAINTIFF'S MENTAL LIMITATIONS

In this case, several sources provided opinions about the limitations resulting from Plaintiff's mental impairments, including: treating psychiatrist Raymond Johnson, M.D. ("Dr. Johnson"); Certified Registered Nurse Practitioner Stephanie Canal ("CRNP Canal"); consultative examiner Tommy Davis, Ph.D. ("Dr. Davis");

and State agency psychological consultant Alex Siegel, Ph.D ("Dr. Siegel"). Plaintiff's first argument pertains to the ALJ's evaluation of CRNP Canal's opinion.

On February 19, 2018, CRNP Canal completed a fill-in-the-blank/check-box "Mental Impairment Questionnaire." (Admin. Tr. 815-823). In Section II of that Questionnaire, CRNP Canal was asked to answer a series of questions about Plaintiff's ability to do work-related activities on a day to day basis in a regular work setting. CRNP Canal assessed that Plaintiff would be unable to satisfactorily perform the following activities: remembering work-like procedures; maintaining attention for a two-hour segment; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being unduly distracted; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number of rest periods; accepting instructions and responding appropriately to criticism from supervisors; responding appropriately to changes in a routine work setting; dealing with normal work stress; and being aware of normal hazards and taking appropriate precautions. *Id.* In the same questionnaire, CRNP Canal assessed that Plaintiff would be expected to be less than 80% as efficient when compared to an average worker, and that Plaintiff

would be expected to miss approximately four days of work per month due to her impairments or treatment. *Id.*

The ALJ gave "little" weight to the opinion of CRNP Canal. In doing so he explained:

> As for the remainder of the opinion evidence, the undersigned gives little weight to the February 2018 opinion of Stephanie B. Canal, indicating the claimant as unable to perform a great number of work-related functional activities satisfactorily; as expected to be less than 80 percent efficient as an average worker; and as likely to be absent from work more than 4 days a month due to her impairments or medical treatments (Exhibit 23F). The opinion's narrative explanation refers to symptoms and clinical findings that are not reflected in the claimant's treatment records and describes potential side effects to medications that the claimant specifically denied suffering. Additionally, the degree of limitation is inconsistent with the claimant's admissions to her providers in the record regarding the efficacy of her medications and treatments and is further inconsistent with the claimant's grossly normal mental status examination findings.

(Admin. Tr. 24).

Plaintiff argues that the ALJ's evaluation of CRNP Canal's opinion is improper for three reasons: (1) the ALJ did not give adequate consideration to the opinion under 20 C.F.R. § 404.1527(c)(2) and 20 C.F.R. § 416.927(c)(2); (2) the ALJ erred by characterizing Plaintiff's mental status examinations as "grossly normal"; and (3) the ALJ was required to recontact CRNP Canal for clarification. I will address each argument below.

      1.     Whether CRNP Canal's Opinion is Entitled to Greater Weight under 20 C.F.R. § 404.1527(c)(2) and 20 C.F.R. § 416.927(c)(2)

With respect to her first argument, Plaintiff contends:

the ALJ failed to evaluate Ms. Canal's opinion in accordance with the checklist of factors that C.F.R. 404.1527 (d) provides. Here, many of these consideration favor crediting Ms. Canal's opinion: Ms. Canal is a nurse practitioner practicing out of Youth Advocate Programs, where Hernandez received care since December 2016. (Tr. 547-80) *See* 404.1527(c)(2)("Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examination or brief hospitalizations.").

(Doc. 11, pp. 10-11).

The Commissioner responds:

Deciding what weight to accord to various medical source opinions is reserved to the Commissioner. 20 C.F.R. §§ 404.1527, 416.927; Social Security Ruling (SSR) 06-3p, 2006 WL 2329939. The Commissioner classifies medical source opinions into two categories "acceptable medical sources" and "other sources;" a nurse practitioner is an "other source." 20 C.F.R. §§ 404.1513, 416.913. Only acceptable medical sources can be "treating sources" within the meaning of the Commissioner's regulations. 20 C.F.R. §§ 404.1502, 416.902; SSR 06-3p. Thus, Nurse Practitioner Canal is neither an acceptable medical source, nor a treating source within the meaning of the Commissioner's regulations.

(Doc. 12, pp. 7-8).[2]

I construe Plaintiff's argument as alleging that the ALJ erred by failing to accord CRNP Canal's opinion weight under 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2)—the only specific provision cited by Plaintiff in her argument. This provision of the regulations is commonly referred to as the "treating physician rule" and states as follows:

> (c) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's medical opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> . . . .
>
>> (2) Treatment relationship. Generally, we give more weight to medical opinions from your **treating sources**, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give

---

[2] I note that SSR 06-03p was rescinded and was not relied upon by the ALJ when the final decision was issued in this case. Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 5845 (Jan. 18, 2017). In its place, the Social Security Administration "added regulatory test in 404.1527(f) and 416.927(f) about how to consider and articulate the consideration of opinions by medical sources who are not acceptable medical sources. *Id.* at 5844

> the treating source's medical opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the medical opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion.

20 C.F.R. § 404.1527(c)(2) (emphasis added); *see also* 20 C.F.R. 416.927(c)(2) (same). In this context, the term "treating source" means "your own **acceptable medical source** who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1527(a)(2) (emphasis added); 20 C.F.R. § 416.927(a)(2) (same). At the time the ALJ issued his decision in this case acceptable medical sources included: licensed physicians (M.D. or D.O.); licensed psychologists; licensed optometrists (for vision impairments only); licensed podiatrist (for foot and ankle only); and qualified speech-language pathologists. Licensed advanced practice nurses are not considered to be acceptable medical sources unless the application was filed on or after March 27, 2017. 20 C.F.R. § 404.1502(a)(7); 20 C.F.R. § 416.902(a)(7). The applications in this case were filed on June 14, 2016. Therefore, CRNP Canal's opinion is not, as a matter of law, entitled to controlling weight under the treating physician rule.

      2.    Whether the ALJ Improperly Characterized the Mental Status Examination Findings as "Grossly Normal"

With respect to her second argument, Plaintiff contends:

contrary to the ALJ's finding, Ms. Canal's opinion was consistent with the record: Supportive signs and symptoms include depressed mood, social isolation, excessive sleep, little interest in doing things, low motivation, history of verbal and physical abuse, panic attacks, helplessness, sleep disturbances, discomfort around crowds, fatigue, appetite disturbance and trouble concentrating. (Tr. 638, 647, 651, 668, 676, 683, 685) Ms. Canal's opinion is also consistent with the opinions of treating psychiatrist Dr. Johnson: During a psychiatric evaluation in January 2017, Hernandez complaint of anxiety. (Tr. 572-73) Examining psychiatrist R. Johnson, MD diagnosed major depressive disorder and PTSD. (Tr. 577) In a letter dated January 12, 2017, R. Johnson MD noted that Hernandez was unable to maintain employment due to depression and panic attacks. (Tr. 446) Given Ms. Canal's longitudinal treatment history with Hernandez and the consistency of his opinion with the medical evidence—the ALJ erred in failing to afford Ms. Canal's opinion great weight.

(Doc. 11, pp. 11-12).

The Commissioner responds:

The ALJ further discounted Ms. Canal's opinions because they were inconsistent with mental status examinations (Tr. 24). Indeed, Dr. Johnson observed on mental status examination that Plaintiff [sic] speech was normal in rate, volume, articulation, and coherence (Tr. 575, 632). He observed that Plaintiff retained normal thought processes with no hallucinations, delusions, preoccupations with violence, homicidal or suicidal ideation or obsessions (Tr. 575-76, 632-33). He observed that Plaintiff maintained intact judgment and insight (Tr. 576, 633). Dr. Johnson observed that Plaintiff was oriented to person, place, and time (Tr. 576-77). He observed that Plaintiff displayed intact recent and remote memory, attention and concentration, and general knowledge (Tr. 577). He observed that Plaintiff's affect was full range and appropriate to content (Tr. 577).

Similarly, Dr. Davis observed on his mental status examination that although Plaintiff's affected [sic] was restricted and her mood was

anxious, her posture and motor behavior were normal and Plaintiff's eye contact was appropriate (Tr. 408). Dr. Davis observed that Plaintiff's speech was fluent and clear and her expressive and receptive language was adequate (Tr. 408). He observed that Plaintiff displayed only mildly impaired attention, concentration, and recent and remote memory skills (Tr. 408). Although Dr. Davis found that Plaintiff's cognitive functioning was below average to average with limited general fund of information, he concluded that Plaintiff still retained fair insight and judgment (Tr. 409).

(Doc. 12, pp. 9-10).

In her argument, Plaintiff cites to several records to support her position that the ALJ inaccurately characterized her mental status examinations as "grossly normal." The first three records cited by Plaintiff are therapy notes from January 13, 2017, July 13, 2017, and October 17, 2017. (Admin. Tr. 638, 647, 651). Although these notes provide insight as to the progress made by Plaintiff in treatment, they do not provide objective mental status examinations. Therefore, these records do not undermine the ALJ's characterization of Plaintiff's mental status examination findings as "grossly normal."

On November 16, 2016, Plaintiff was examined by behavioral health after being assessed with a score of 23 on a Patient Health Questionnaire for Depression ("PHQ-9").[3] Psychologist Charles Goins recorded the following assessment:

---

[3] A PHQ-9 score of 23 corresponds with severe depression. PHQ-9 Questionnaire for Depression Scoring and Interpretation Guide, https://www.med.umich.edu/1info/FHP/practiceguides/depress/score.pdf (last

Natalie was referred to BH for consult due to PHQ9 score of 23. She denied SI, Intent, or plan. Hopelessness was denied. Natalie reported her history of depression and anxiety. Reported symptoms included low motivation, depressed mood, sleep problems, fatigue, inconsistent appetite, low self esteem, low concentration, discomfort around crowds, and sluggish movement. Identified stressors included death of father this summer, chronic medical issues, conflict with housemate, recent move from NY, inability to work due to medical issues, unemployment, finances. Natalie denied any history of self harm and she denied any history of participating in IP psychiatric treatment, outpatient mental health therapy. Substance abuse issues were denied. She reported that she was prescribed sertraline by her previous pcp but Natalie stopped taking it as she believed that it made her nauseated. Natalie acknowledged that she experienced verbal abuse by housemate but denied safety concerns and declined support today for finding emergency housing/shelter options. Help booklet provided. She reported that she received significant support from her adult children and Natalie reported that she would contact crisis if experiencing unsafe thoughts or urges.

(Admin. Tr. 685).

On December 22, 2016, Plaintiff presented for a behavioral health follow up.

(Admin. Tr. 683). Psychologist Charles Goins recorded the following assessment:

Natalie retuned to BH for follow up. PHQ9 score was 23 and she denied SI, HI, intent, or plan. Hopelessness was denied. Natalie reported that injection had resulted in reduction in pain levels (rated as 7) and increased mobility. Sleep problems continue to have negative impact on daily functioning. When to CMU and was given psychiatry appt for Youth Advocate for 1/12 at 1:30pm. She has a therapy appt at Youth Advocate for next Tues 12/27. Natalie has increased time spent outside by attending Church and connecting with female peer who

---

visited 2/7/2020). Any score above 14 "warrants treatment for depression, using antidepressant, psychotherapy and/or a combination of treatment. *Id.*

> gave her a ride. She identified a book store in her area that she would
> like to go to read. Natalie developed plan to attend Church Saturday.
> BH praised Natalie for her active and successful efforts at managing
> her treatment/recovery process. She has ample food due to attending
> food bank. She reported that she had gained some degree of friendship
> with the female companion of housemate that she had friction with.
> Natalie shared that she was reluctant to follow through with CMU
> worker developed plan for her to go to shelter in order to be moved
> onto the list for housing. She reported her improved self esteem at
> being better able to complete ADL's as desired. She accepted praise
> for the gains in her appearance and active input to discussion. No BH
> follow up will be scheduled due to scheduled transition to specialized
> outpatient services.

(Admin. Tr. 683). On January 12, 2017, Plaintiff was examined by Psychologist

Raymond Johnson, Ph.D. (Admin. Tr. 575-77). Dr. Johnson noted the following

findings on mental status examination: normal speech; normal thought processes;

no suicidal or homicidal ideation; intact judgment; orientation to person, place, and

time; intact recent and remote memory; intact attention and concentration; intact

general knowledge; appropriate affect; and restricted ability to abstract. *Id.* Dr.

Johnson was unable to assess Plaintiff's mood. *Id.*  On June 6, 2017, Plaintiff was

examined during a routine medical appointment. (Admin. Tr. 676). The treatment

note from that examination suggests that Plaintiff reported anxiety and sleep

disturbances. *Id.* The only objective finding related to Plaintiff's mental

impairments, however, is that Plaintiff was oriented to time, place, and person. *Id.*

On October 4, 2017, Plaintiff sought medical treatment for abdominal pain.

(Admin. Tr. 667). The treatment note from that examination documents a score of

16 on the Patient Health Questionnaire for Depression. (Admin. Tr. 668).[4]

Reviewing this evidence, I find that the ALJ did not mischaracterize

Plaintiff's mental status examination findings when he described as "grossly

normal." Accordingly, I find that the ALJ's decision to discount CRNP Canal's

opinion on that basis is supported by substantial evidence.

### 3.  Whether the ALJ was Required to Recontact CRNP Canal for Clarification

With respect to her third argument, Plaintiff contends:

> if the ALJ was unable to discern how Ms. Canal's opinion was
> supported, given that the record contained Ms. Canal's treatment
> records, the ALJ should have recontacted Ms. Canal to contain further
> explanation of the opinion. *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th
> Cir. 2004), *quoting Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir.
> 1996)("If the ALJ though he needed to know the basis of [medical]
> opinions in order to evaluate them, he had a duty to conduct an
> appropriate inquiry, for example, by subpoenaing the physicians or
> submitting further questions to them.").

(Doc. 11, pp. 10-12).

The Commissioner responds:

> Plaintiff also asserts that the ALJ should have re-contacted Ms. Canal
> to obtain further explanation of her opinions (Pl.'s Br. at 11). The ALJ
> was under no such obligation. Effective March 26, 2012, the
> Commissioner revised the regulations on recontacting medical

---

[4] A PHQ-9 score between 15 and 19 is indicative of moderately severe depression.
PHQ-9 Questionnaire for Depression Scoring and Interpretation Guide,
https://www.med.umich.edu/1info/FHP/practiceguides/depress/score.pdf       (last
visited 2/7/2020).

sources, and eliminated 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1). *See Buckner v. Astrue*, 2012 WL 5392255, at *11, n.4 (W.D. Pa. Nov. 5, 2012). Prior to this amendment, the regulations stated that medical sources must be recontacted when "the report from [the] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1) (2011). The regulations controlling at the time of the ALJ's decision explain that "if any of the evidence in your case record, including any medical opinion(s) and prior administrative medical findings, is inconsistent, we will consider the relevant evidence and see if we can determine whether you are disabled based on the evidence we have." 20 C.F.R. §§ 404.1520b(b)(1); 416.920b(b)(1). In other words, the ALJ was entitled to reply on the evidence that he had to determine whether Plaintiff was disabled, and was not required to recontact any medical source. The revised governing regulation further explain [sic] that an ALJ "*may*" recontact a medical source. 20 C.F.R. §§ 404.1520b(b)(2)(i), 416.920b(b)(2)(i) (emphasis added). Under the controlling regulations, there is never an obligation to recontact a medical source. Accordingly, under the governing regulation in effect at the time of Plaintiff's decision, the ALJ was under no obligation to recontact Ms. Canal.

(Doc. 12, pp. 10-11).

The regulations on this subject explain that, after the ALJ reviews all of the evidence, he or she makes findings about what that evidence shows. 20 C.F.R. § 404.1520b; 20 C.F.R. § 416.920b. If the ALJ cannot make a determination because the evidence in the record is incomplete or inconsistent the ALJ *may* take the following actions:

(1) If any of the evidence in your case record, including any medical opinion(s) and prior administrative medical findings, is inconsistent,

we will consider the relevant evidence and see if we can determine whether you are disabled based on the evidence we have.

(2) If the evidence is consistent but we have insufficient evidence to determine whether you are disabled, or if after considering the evidence we determine we cannot reach a conclusion about whether you are disabled, we will determine the best way to resolve the inconsistency or insufficiency. The action(s) we take will depend on the nature of the inconsistency or insufficiency. We will try to resolve the inconsistency or insufficiency by taking any one or more of the actions listed in paragraphs (b)(2)(i) through (b)(2)(iv) of this section. We might not take all of the actions listed below. We will consider any additional evidence we receive together with the evidence we already have.

> (i) We may recontact your medical source. We may choose not to seek additional evidence or clarification from a medical source if we know from experience that the source either cannot or will not provide the necessary evidence. If we obtain medical evidence over the telephone, we will send the telephone report to the source for review, signature, and return;
>
> (ii) We may request additional existing evidence;
>
> (iii) We may ask you to undergo a consultative examination at our expense (see §§ 416.917 through 416.919a); or
>
> (iv) We may ask you or others for more information.

(3) When there are inconsistencies in the evidence that we cannot resolve or when, despite efforts to obtain additional evidence, the evidence is insufficient to determine whether you are disabled, we will make a determination or decision based on the evidence we have.

20 C.F.R. § 404.1520b(b); 20 C.F.R. § 416.920b(b). The evidentiary record in this

case includes over 500 pages of medical records, opinions by four sources, along

with statements by Plaintiff about her limitations and day-to-day functioning.

Although this evidence undoubtedly contains inconsistencies, the shortcomings in the opinions submitted by CRNP Canal do not make this record (as a whole) insufficient. Because the record as a whole was sufficient for the ALJ to reach a conclusion, remand is not required. *See Grier v. Berryhill,* No. 18-386, 2019 WL 2870728, at *10 (D. Del. July 3, 2019) (citing *Campell v. Colvin*, 2016 WL 4503341, at *3 (W.D. Pa. Aug. 29, 2016) ("An ALJ may only consider recontacting a treating physician, where the evidence is consistent but there is insufficient evidence to determine whether a claimant is disabled or after weighing the evidence the ALJ cannot reach a conclusion about whether a claimant is disabled. The ALJ, however, is not obligated to do so.")). Accordingly, I am not persuaded that remand is required so that the ALJ can recontact CRNP Canal.

      C.    WHETHER THE ALJ PROPERLY EVALUATED PLAINTIFF'S STATEMENTS ABOUT HER SYMPTOMS

Next, Plaintiff argues that the ALJ failed to properly evaluate Plaintiff's statements about her mental health related symptoms and limitations, including allegations about mood, mania and social interaction. In an adult function report form completed by Plaintiff, and received by the Social Security Administration on August 22, 2016, Plaintiff was asked to answer a series of questions about her symptoms and limitations. On that form, Plaintiff reported that she: has anxiety and can't be around too many people; cries for no reason; has days where she can't

get out of bed and doesn't want to shower due to depression; just wants to be left alone; does not engage in any social activities; has problems getting along with family, friends, neighbors and others because "they just annoying"; and was fired from one job because she didn't get along with her boss. (Admin. Tr. 233-240).

During the administrative hearing, Plaintiff made the following statements about these symptoms:

> Q    Why do you claim that you can no longer work?
>
> A    Well, I have—I get panics [sic] attacks. I get—I have a situation that I have—on my feet. I have severe depression where I'm always most of the time depressed. And I have other health issues like I get severe migraines and high blood pressure.
>
> . . . .
>
> Q    . . . How often do you get panic attacks?
>
> A    I get them like twice a week. I try to have them under control with my medication
>
> Q    And do you know why you get the panic attacks?
>
> A    Well, I –sometimes I get them because I—there is a lot of arguments in the house.
>
> . . . .
>
> Q    And how does your depression affect you?
>
> A    It affects my—sorry, I'm nervous. It affects my thoughts and communication.
>
> . . . .
>
> Q    Do you take your medications regularly as prescribed?

Page 24 of 36

A       Yes.

Q       Do they relieve your symptoms?

A       They relieve, yes.

. . . .

Q       Do you have any problems getting along with other people?

A       No.

. . . .

Q       Do you have any thoughts of harming other people?

A       No, never.

. . . .

Q       Okay. But the panic attacks, how long do they last when you get them?

A       Like a good fifteen minutes.

Q       And how does it feel when you get a panic attack?

A       Oh, my gosh, I feel like my heart is going to come out my mouth, and I start shaking. I am short of breath.

Q       Do you—are panic attacks and anxiety attacks the same thing for you?

A       I believe so.

Q       Okay. And what do you do to try and make a panic attack go away once it starts? Do you have any techniques or things that you do?

A       Yeah, I try in my breathing, like my therapist tells me.

Q       And the medications that you take, how are they helping with your panic attacks?

A      They help me pretty much.

Q      Okay.

A      They ease me down a little bit.

Q      What do you mean by that? Do they change the number of them that you have?

A      They like—I drink them, and it takes a little bit but it slowly brings me down from my anxiety, little by little.

Q      So you—not only do you do the breathing, you take the medication when you get a panic attack?

A      Yes, I do.

Q      Okay. Do you get crying spells?

A      Yes, I do.

Q      How often?

A      Most of the time, I'm—how often is like three or our times a day.

Q      Do you know what triggers one? Do you know what a trigger is for your crying spells?

A      I think a lot—

Q      Is there a thought that, or certain things that trigger them?

A      Yes, I live with other people, and they constantly having problems, and I just with I had my own so I can be able to be in peace. I'm sorry.

. . . .

Q      Do you have mood swings?

A      Yeah.

Q      What moods do you have mood swings of? What do they swing
       between?

A      Sometimes I can be okay, and then next I can be irritated,
       agitated.

Q      And do you get flashbacks?

A      Yes.

Q      How often do you get them?

A      I get them like maybe twice a week.

Q      Do you know what triggers a flashback for you?

A      Thinking too much. I can get a lot of nightmares at night too.

. . . .

Q      And do you have any idea how long a flashback lasts for you?

A      I have no idea. I just—it's in—like an instant flashback, and I
       just try to distract myself.

Q      What—how do you feel after a flashback's over?

A      I don't—I feel a little nervous—

Q      How long—

A      --agitated.

Q      Okay. How long does that last after you have a flashback?

A      Like 10 minutes.

(Admin. Tr. 41-53).

       In his decision, the ALJ found that although "the claimant's medically

determinable impairments could reasonably be expected to cause the alleged

symptoms. . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Admin. Tr. 22-23). The ALJ explained:

> The medical evidence does not support the allegations regarding the intensity, persistence, or limiting effects of the claimant's impairments. Though the record shows the claimant suffers from mental health impairments, her impairments are not established until 7 months after her alleged onset date. Additionally, the claimant's treatment notes show that her mood and mania symptoms are well-controlled with medications and that her medications do not cause any adverse side-effects. Moreover, the claimant's mental status examinations reveal little evidence of any significant impairment in attention, concentration, or memory as alleged by the claimant. The claimant's examination records further show she interacts appropriately and clearly despite her alleged social anxiety. The medical evidence does not support the claimant's allegations.

(Admin. Tr. 24).

Plaintiff argues that the ALJ's analysis of Plaintiff's statements about her symptoms is flawed for three reasons: (1) the ALJ applied a clear and convincing evidence standard instead of the required preponderance of the evidence standard; (2) the ALJ improperly found that a doctor's observation that Plaintiff's condition was "controlled with medication" supported the conclusion that Plaintiff could

work; and (3) the ALJ improperly relied on his own lay opinion to discount the

opinion of CRNP Canal.[5]

      1.    Whether the ALJ Applied the Wrong Evidentiary Standard in Evaluating Plaintiff's Statements about her Symptoms

With respect to her contention that the ALJ applied the wrong evidentiary

standard, Plaintiff argues:

> In evaluating Hernandez's symptoms, the ALJ stated that her allegations were "not entirely consistent with the medical evidence and other evidence in the record". (Tr. 22, 23) The "not entirely consistent" standard implies that the ALJ used a clear and convincing evidence standard. But, and ALJ must decide a case based upon a preponderance of the evidence standard. Moreover, the ALJ's decision contains no discussion of which allegations he found consistent with the record. The ALJ's symptom evaluation violates SSR 16-3p which states that ALJs will consider the consistency of a claimant's allegations with the medical and other evidence, but it does not mandate that the claimant's allegations be completely consistent with the record. *See* SSR 16-3p ("In determining whether an individual is disabled, we consider all of the individual's symptoms, including pain, and the extent to which the symptoms can *reasonably* be accepted as consistent with the objective medical and other evidence in the individual's record") (emphasis added).

(Doc. 11, pp. 12-13).

    Although the Commissioner generally responded that the ALJ's evaluation

of Plaintiff's statements about her symptoms was correct, the Commissioner did

not address Plaintiff's allegation that the ALJ applied the wrong evidentiary

---

[5] I note that the second and third arguments in Plaintiff's "symptom evaluation" section do not relate to the ALJ's evaluation of Plaintiff's testimony about her symptoms. Instead, they appear to address the evaluation of medical opinion evidence.

standard when evaluating Plaintiff's statements about her symptoms. Nonetheless, I am not persuaded that the ALJ's use of the phrase "not entirely consistent with the medical evidence and other evidence in the record," suggests that the ALJ applied a clear and convincing evidence standard.

The Commissioner's regulations define "symptoms" as the claimant's own description of his or her impairment. 20 C.F.R. § 404.1502(1); 20 C.F.R. § 416.902(i); SSR 96-4p, 1996 WL 374187. A symptom, however, is not a medically determinable impairment, and no symptom by itself can establish the existence of such an impairment. SSR 96-4p, 1996 WL 374187. The ALJ is not only permitted, but also required, to evaluate the credibility of a claimant's statements about all symptoms alleged and must decide whether and to what extent a claimant's description of his or her impairments may be deemed credible. In many cases, this determination has a significant impact upon the outcome of a claimant's application, because the ALJ need only account for those symptoms – and the resulting limitations – that are credibly established when formulating his or her RFC assessment. *Rutherford*, 399 F.3d at 554. To facilitate this difficult analysis, the Commissioner has devised a two-step process that must be undertaken by the ALJ to evaluate a claimant's statements about his or her symptoms.

First, the ALJ must consider whether there is an underlying medically determinable impairment that can be shown by medically acceptable clinical and

laboratory diagnostic techniques that could reasonably be expected to produce the symptom alleged. 20 C.F.R. § 404.1529(b); 20 C.F.R. § 416.929(b). If there is no medically determinable impairment that could reasonably produce the symptom alleged, the symptom cannot be found to affect the claimant's ability to do basic work activities. 20 C.F.R. § 404.1529(b); 20 C.F.R. § 416.929(b); SSR 96-4p, 1996 WL 374187; SSR 16-3p, 2016 WL 1119029.

Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms which can be reasonably attributed to a medically determinable impairment. 20 C.F.R. § 404.1529(c)(1); 20 C.F.R. § 416.929(c)(1). Symptoms will be determined to reduce a claimant's functional capacity only to the extent that the alleged limitations and restrictions "can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4); 20 C.F.R. § 416.929(c)(4). However, an ALJ will not reject statements about the intensity, persistence, or limiting effects of a symptom solely because it is not substantiated by objective evidence. 20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3). Instead, the ALJ will evaluate the extent to which any unsubstantiated symptoms can be credited based on the following factors: the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; any factor that precipitates or aggravates the claimant's pain or other symptoms; the type, dosage, effectiveness, and side effects

of any medication the claimant takes or has taken to alleviate his or her pain or other symptoms; any treatment, other than medication, the claimant receives or has received for relief of his or her pain or other symptoms; any measures the claimant uses or has used to relieve his or her pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and any other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3).

An ALJ's findings based on the credibility of a claimant are to be accorded great weight and deference, since an ALJ is charged with the duty of observing a witness's demeanor and credibility. *Frazier v. Apfel*, No. 99-CV-715, 2000 WL 288246, at *9 (E.D. Pa. Mar. 7, 2000) (*quoting Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). An ALJ is not free to discount a claimant's statements about his or her symptoms or limitations for no reason or for the wrong reason. *Rutherford*, 399 F.3d at 554.

As noted above, the Commissioner's regulations merely require that a claimant's symptoms be "reasonably"—as opposed to entirely—consistent with objective medical evidence to be credited. Plaintiff argues that the ALJ applied the wrong standard based on his use of popular boilerplate "not entirely consistent" language. Nonetheless, I am not persuaded by Plaintiff's argument that use of this boilerplate phrase requires remand in this case. Similar arguments involving bad

boilerplate have been raised in this court, and in others across the country. Courts have generally concluded that the use of "bad boilerplate" in an ALJ's evaluation of a claimant's statements does not automatically undermine or discredit an ALJ's ultimate conclusion. *Ronald B. v. Saul,* No. 18-CV-5881, 2019 WL 3778070 at \*5 (N.D. Ill. Aug. 12, 2018). This type of error is harmless so long as the ALJ points to information that justifies his or her conclusion. *Id.* Although the ALJ's decision in *Ronald B.* was ultimately remanded because the ALJ's "explanation failed to build an 'accurate and logical bridge' between the evidence and her conclusions," that certainly is not the case here. As quoted in section IV.C.1. of this Opinion, the ALJ relied on the unremarkable findings by clinicians on mental status examination, the effectiveness of Plaintiff's medications, and Plaintiff's demonstrated ability to interact with others in a clinical setting to discount her testimony that her impairments cause crippling social anxiety, as well as frequent uncontrolled mood swing, panic attacks, and anxiety attacks that would prevent her from working. Accordingly, I find that the ALJ's use of bad boilerplate in his credibility assessment does not require remand in this case.

2.   Whether the ALJ Improperly Inferred that Plaintiff's stability on medication meant that Plaintiff could work, and Improperly Relied on his own Lay Opinion to Discount CRNP Canal's Assessment

Plaintiff's second and third arguments in the "Symptom Evaluation" section of her brief do not appear to relate to symptom evaluation. Instead, they both address the ALJ's evaluation of medical opinion evidence. As such, I will address them together. Specifically, Plaintiff argues:

> the ALJ noted that treatment notes show that Hernandez's mood and mania were well-controlled with medication. (Tr. 24) However, the ALJ failed to note that having a controlled condition does not mean that the claimant is not disabled. *See Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000) (the Court found that a doctor's observations that a patient is "stable and well controlled with medication" during treatment did not support the medical conclusion that the patient could return to work.)

> the ALJ remarked that the examination records show that Hernandez interacted appropriately and clearly despite her alleged social anxiety. (Tr. 24) But, the ALJ impermissibly substituted his lay opinion for the opinion of treating source Ms. Canal who was specifically tasked with evaluating Hernandez's ability to interact with others, not her ability to be polite to a doctor. Here, the ALJ cited no medical evidence whatsoever and relied on anecdotal evidence to reject Ms. Canal's opinion. This is relevant because Hernandez complained of social isolation. (Tr. 638, 647, 651)

> As the ALJ provided no reasonable basis for discounting Hernandez's allegations, his decision must be reversed.

(Doc. 11, pp. 11-14).

Although the Commissioner generally responded that the ALJ's evaluation of Plaintiff's statements about her symptoms was correct and addressed other arguments related to the evaluation of CRNP Canal's opinion, the Commissioner did not address Plaintiff's allegations.

In support of her "second" and "third" arguments, Plaintiff relies on *Morales v. Apfel*, 225 F.3d, 310 (3d Cir. 2000). In *Morales,* the record included opinions by one nontreating psychologist (Dr. Jaffe), one nontreating psychiatrist (Dr. Linder), one treating psychiatrist (Dr. Erro), and two nonexamining psychologists (Dr. Barrett and Dr. Brennan). The opinions by Dr. Jaffe, Dr. Linder, and Dr. Erro included significantly more serious mental limitations than the opinions of Dr. Barrett and Dr. Brennan. Also significant in this case, Dr. Jaffe noted he suspected the claimant of malingering, but that malingering was a symptom of one of the claimant's diagnosed mental conditions. The ALJ in *Morales* accepted the opinions of Dr. Barrett and Dr. Brennan, and rejected all others based on the ALJ's own impression that the claimant was "manipulative, unmotivated, and possibly malingering," and that the claimant's IQ scores did not "comport with claimant appearance and demeanor." *Id.* at 314. The Third Circuit held that the ALJ's rejection of the opinions by Dr. Jaffe, Dr. Linder, and Dr. Erro was not supported by substantial evidence because the ALJ's refusal to credit these opinions was not based on objective evidence, and instead was merely based on the ALJ's own "amorphous impressions." *Id.* at 318. After concluding that these opinions were improperly rejected, the Third Circuit remanded because "the ALJ did not give proper consideration to the opinions of Dr. Erro, Dr. Jaffe, and Dr. Lindner, all of which present counterveiling [sic] evidence to the Brennan/Barrett evaluation." *Id.*

at 319. Unlike in *Morales*, the ALJ in this case cited to evidence in the record including Plaintiff's mental health treatment records and the opinions of doctors Davis (Ex. 4F) and Siegel (Exs. 1A, 2A) (whose opinions he accorded great weight) before concluding that Plaintiff was not disabled. Accordingly, I am not persuaded that remand is required under *Morales*.

V.     CONCLUSION

For the reasons stated herein, Plaintiff's request for the award of benefits, or in the alternative a new administrative hearing is DENIED as follows:

(1)    The final decision of the Commissioner should be AFFIRMED.

(2)    Final judgment should be issued in favor of Andrew Saul, Commissioner of Social Security.

(3)    An appropriate order shall issue.

Date: June 22, 2020                    BY THE COURT

                                       *s/William I. Arbuckle*
                                       William I. Arbuckle
                                       U.S. Magistrate Judge